UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN TEOPANTA SALAZAR, Petitioner, -against- LADEON FRANCIS, et al., Respondents. | Case No. 1:26-cv-07160 (JLR) **OPINION AND ORDER** |

JENNIFER L. ROCHON, United States District Judge:

Petitioner Juan Teopanta Salazar ("Petitioner" or "Teopanta") was detained by Immigration and Customs Enforcement ("ICE") on August 21, 2026. Before the Court is his petition for a writ of habeas corpus under 28 U.S.C. § 2241, in which he challenges the legality of his detention and seeks his immediate release or, in the alternative, a constitutionally adequate bond hearing. The Court held a hearing on the petition on September 1, 2026. For the following reasons, the Court GRANTS the petition and orders Teopanta's immediate release.

## BACKGROUND

Teopanta is a citizen of Ecuador. *See* Dkt. 1 ("Pet." or the "Petition") ¶ 23. He entered the United States on or around November 27, 2022, in El Paso, Texas. *Id.* ¶¶ 36, 38; *see* Dkt. 15 ("Johnson Decl.") ¶ 4. Since that time, he has resided in Queens, New York, and he has not departed the United States. Pet. ¶¶ 38-39. He is married, and "[h]is wife is present in the United States," as are five of his six children. *Id.* ¶¶ 48-49. On November 27, 2023, Teopanta filed an affirmative application for asylum, withholding of removal, and protection under the Convention Against Torture. *Id.* ¶ 40.

Teopanta's Petition does not include factual allegations concerning what happened when he entered the United States. Respondents contend that he was detained at some point between

November 27 and 29, 2022, and, on November 29, 2022, "released on humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5)(A) due to lack of detention capacity at the Central Processing Center in El Paso, Texas." Johnson Decl. ¶¶ 5-6. Teopanta states that his asylum application "records [his] status at [his November 2022] entry as 'HPW,' with an associated status expiration date of January 30, 2023." Pet. ¶ 37; *see* Dkt. 3-6 at 2. Teopanta's counsel states that she "understands 'HPW' to be [an immigration authority] notation associated with short-term authorized release from custody at or near the border," and she notes "that the approximately sixty-day authorized period reflected on the form is consistent with the short-term parole periods issued at the southwest border at that time." Pet. ¶ 37.

At the time of filing, Teopanta's counsel did not have information regarding the circumstances of Teopanta's arrest by ICE, the statutory authority for his current detention, or whether ICE had provided Teopanta an individualized determination regarding his risk of flight or danger to the community; that information, counsel stated, was "uniquely within Respondents' possession." *Id.* ¶ 59; *see id.* ¶¶ 56-58.

According to Respondents, Teopanta was arrested on February 8, 2025, for various criminal charges that were later dismissed. *See* Johnson Decl. ¶ 8. On February 10, 2025, ICE received "an alert" that Teopanta had been placed in criminal custody and released on his own recognizance. *Id.* ¶ 9. ICE "[s]ubsequently . . . made the decision to conduct a targeted enforcement action to apprehend" Teopanta based on that arrest. *Id.* ¶ 10. It is unclear when ICE made that decision. Still less clear is why it took ICE more than a year and a half to issue a warrant for, and "conduct[] [the] targeted enforcement action" to effectuate, Teopanta's arrest. *Id.* ¶ 12 (representing that Teopanta was apprehended on August 21, 2026); *see id.* ¶ 11 (representing that ICE issued a warrant for Teopanta's arrest on August 18, 2026). On August 21, 2026, ICE conducted an individualized custody determination for Teopanta. *Id.* ¶ 15. ICE

memorialized that determination on a *Velesaca* worksheet, which states that Petitioner established that he did *not* pose a danger to persons or property and that Petitioner established that he was *not* a flight risk. *See* Dkt. 17-4. Notwithstanding this, ICE detained Petitioner.

ICE's explanation of its custody determination, and the conflicting *Velesaca* worksheet, is as follows:

> Supervisory Detention and Deportation Officer ("S.D.D.O.") Ross Cowan conducted an initial custody determination and determined that Petitioner established that he *did not* pose a danger to persons or property, and that Petitioner had established that he *did not* pose a flight risk, but also that Petitioner had no ties to the community and had illegally entered the United States. The box next to "Has the individual established that he/she does not pose a flight risk?" was erroneously marked "Yes." This is because the following box, "If the noncitizen does pose a flight risk, have you determined that no forms of release on conditions can mitigate flight risk?" was also marked "Yes." It was further written: "No ties to the community, Illegally entered the United States."

Johnson Decl. ¶ 15 (emphasis added); *see also* Dkt. 17-4. S.D.D.O. Kareem Johnson, who provided this explanation, does not represent that he was involved in Teopanta's initial custody determination, or even that he spoke to S.D.D.O. Cowan about S.D.D.O. Cowan's determination; Johnson states only that his "representations are based on [his] review of Petitioner's administrative file, consultation with [his] colleagues, and ICE electronic records and databases." Johnson Decl. ¶ 2.

On August 31, 2026 — after the Petition had been fully briefed, explicitly in response to Petitioner's reply brief, and without first seeking leave of the Court to file a sur-reply — Respondents submitted a declaration from S.D.D.O. Cowan, *see* Dkt. 20 ("Cowan Decl."), a letter "to provide additional information" to the Court, Dkt. 21, and two additional exhibits, *see* Dkts. 21-1–21-2. In the Cowan Declaration, S.D.D.O. Cowan states that he did, in fact, find that Teopanta is a flight risk, but that he simply checked the wrong box on the *Velesaca* worksheet. Cowan Decl. ¶ 7. The Court should not be concerned with that error, Cowan

suggests, because, as it turns out, he "should not have conducted an individualized custody determination" at all given that Teopanta is subject to mandatory detention under Section 1225(b)(2)(A). *Id.* ¶ 8. What he really should have done, he represents now, was "check[] the box at the top of the first page" of the *Velesaca* worksheet "stating 'Individual is NOT subject to § 236(a),' and then skipped to the bottom and signed the form without completing the danger or flight risk sections." *Id.* ¶ 9. For the same reason, he avers, Teopanta should not have been issued a Form I-286. *Id.*

Respondents' belated submission also includes documentation from November 2022 reflecting that Teopanta was paroled into the United States after his initial detention. *See* Dkt. 21-1 at 3 (November 29, 2022 Form I-213 stating that Teopanta "was Paroled due to detention capacity at the Central Processing Center in El Paso, TX"). That parole was scheduled to last "[u]ntil Jan[uary] 30, 2023." Dkt. 21-2 at 2. Teopanta responded to Respondents' filing the same day. *See* Dkt. 22.

**DISCUSSION**

Teopanta contends that his detention under either Section 1225(b)(2)(A) or Section 1226(a) is improper. With respect to the former, he argues that "[h]e is not presently 'seeking admission,'" because he "entered the United States in November 2022, has resided in the interior of the United States continuously since, and seeks asylum, withholding of removal, and protection under the Convention against torture." Pet. ¶ 80. With respect to the latter, he argues that "no officer made or communicated any individualized determination that Petitioner poses a danger to persons or property or a risk of flight, . . . and no Form I-286 or equivalent notice of custody determination was served." *Id.* ¶ 81. Respondents contend that Teopanta is subject to mandatory detention under Section 1225(b)(2)(A) because he was paroled in November 2022 after his initial detention. *See* Dkt. 16 ("Opp.") at 7-11. In the alternative, Respondents argue

that Teopanta received an initial custody determination sufficient to permit his discretionary detention under Section 1226(a), and thus if he is detained under that section, he should be given, at most, a bond hearing. *See id.* at 14-16. The Court agrees with Teopanta.

## I. Teopanta Is Detained Under Section 1226(a)

Respondents first argue that Teopanta is a parolee, that he is therefore "seeking admission" into the United States, and that accordingly he is subject to detention under Section 1225. Opp. at 5. Teopanta — without the benefit of the information in Respondents' eleventh-hour submission — argues that he was not paroled into the United States and that, even if he had been, the only documentation available suggests that any such parole ended in January 2023. Dkt. 18 ("Reply") at 3. The Court agrees with Teopanta on both points.

To begin, there was precious little documentation before this Court establishing that Teopanta was paroled into the United States after his initial detention near the border in November 2022, until Respondents' unauthorized sur-reply. Respondents *said* that he was paroled, *see* Johnson Decl. ¶ 6; Opp. at 2, yet they provided no documentation of that status and, indeed, did not state whether or when it terminated. The only evidence Respondents pointed to was the Johnson Declaration, which, in turn, cited no evidence in support of its bare assertion that Teopanta was released on humanitarian parole in November 2022. *See* Opp. at 2, 8 (citing Johnson Decl. ¶ 6);[1] *see* Johnson Decl. ¶ 6. Teopanta noted that there was some indication in the record that he was — at one time, and according only to his self-report on his asylum application — on some form of short parole that expired in January 2023. *See* Pet. ¶ 37; Reply at 3; Dkt. 3-6 at 2 (Teopanta's asylum application listing, under "Most Recent Entry Record," that his "[s]tatus" as of "11/27/2022" was "HPW," and that such status "[e]xpire[d]" on

---

[1] On page 8 of their Opposition, Respondents actually cite Johnson Decl. "at 5." Opp. at 8. The Court understands this to be a citation error.

"01/30/2023"). Respondents have now filed documentation confirming this to have been the case. *See* Dkt. 21-2; *see also* Cowan Decl. ¶ 4 ("Parole was authorized until January 20, 2023, after which it would automatically expire unless expressly extended. Petitioner's parole was not extended beyond January 30, 2023."). But Respondents' contention that Teopanta is presently "seeking admission" based on this expired parole is one this Court rejected in *Campbell v. Almodovar*, No. 25-cv-09509 (JLR), 2025 WL 3538351 (S.D.N.Y. Dec. 10, 2025). There, this Court held that a noncitizen who had lived in the United States for a term of years after expiration of his parole, and who had filed an affirmative application for asylum, was no longer "seeking admission" but rather was, "[i]f anything . . . seeking 'to obtain a lawful means to *remain* here' through his asylum application," and that Section 1225 "d[id] not apply" to his detention. *Id.* at *6 (quoting *Lopez Benitez*, 795 F. Supp. 3d at 488 n.7). The Second Circuit affirmed that underlying reasoning in *Barbosa da Cunha v. Freden*, where it held that "Congress [did not] intend to mandate detention of noncitizens who are 'applicants for admission' but not 'seeking admission,' such as illegal entrants, like [p]etitioner, who have nonetheless lived in the United States for a substantial time." 175 F.4th 61, 78 (2d Cir. 2026).

Respondents read *da Cunha* narrowly, attempting to confine it to the fact that its petitioner "entered the United States without inspection and admission" and was detained some twenty years later in the interior, without ever having been paroled into the country, *id.* at 70; thus, they conclude, the Second Circuit's "analysis of 'seeking admission' did not reference parole" and does not apply to it, and *da Cunha* "did not directly address the detention authority for arriving . . . noncitizens who were initially apprehended at the border, paroled . . ., and later rearrested in the interior." Opp. at 8. Instead, they argue, Teopanta remains "constructively at the border," and thus "shall continue to be dealt with in the same manner as that of any other applicant for admission." *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)).

It is true that the *da Cunha* petitioner was never paroled into the country. But the gap between Teopanta's case and *da Cunha* is not wide enough to accommodate what Respondents are trying to push through it. Indeed, Respondents have recently tested this same argument in various courts in this District and Circuit post-*da Cunha*, and it has not found purchase. *See, e.g.*, *Eltayeb v. Genalo*, No. 26-cv-06090 (VEC), 2026 WL 2364647, at *2 (S.D.N.Y. Aug. 14, 2026) (rejecting government's argument that "an immigrant who was apprehended but later released on parole is an 'arriving alien' because parole freezes the immigrant's legal status in time," and holding instead that "[a]ny determination of detention at this point — post-parole expiration — must be made under the discretionary framework of § 1226(a)" (emphasis omitted)); *Bernal Morales*, 2026 WL 2445050, at *5 (noting that "most district courts in this Circuit to consider the question have concluded that under the construction held decisive in *Barbosa da Cunha*, § 1225(b) does not apply to noncitizens whose parole has expired and whom ICE thereafter takes into custody," and thus rejecting government's argument that Section 1225(b)(2)(A) authorized detention of petitioner whose parole "expired nearly four years before ICE elected to detain him"); *see also Simms v. Arteta*, No. 26-cv-05712 (LJL), 2026 WL 2076009, at *2-3 (S.D.N.Y. July 17, 2026) (similar); *J.H.F. v. Arteta*, No. 26-cv-04076 (AT), 2026 WL 1724066, at *5-6 (S.D.N.Y. June 14, 2026) (similar); *Hernandez Villasmil v. Blanche*, No. 26-cv-00713, 2026 WL 1235068, *5-6 (N.D.N.Y. May 5, 2026) (similar). This Court does not find it persuasive, either. Even if *da Cunha* does not control Teopanta's case, the Court adheres to its own reasoning in *Campbell* and further joins the reasoned opinions of its colleagues in this Circuit, and holds that Teopanta is detained under Section 1226(a), not Section 1225(b)(2)(A).

Further supporting that conclusion, all the documents that ICE issued to Teopanta upon his arrest confirm that ICE detained him under authority of Section 1226 — not under Section

1225, as Respondents now claim. The Form I-200 arrest warrant, issued August 18, 2026, invokes Section 1226. *See* Dkt. 17-3 at 2 (warrant empowering "[a]ny immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act" to arrest Teopanta); *see Hyppolite v. Noem*, 808 F. Supp. 3d 474, 482 (E.D.N.Y. 2025) ("Section 236 of the INA is codified at 8 U.S.C. § 1226."). The *Velesaca* worksheet invokes Section 1226. *See* Dkt. 17-4 at 2 (checking box stating that Teopanta "is subject to § 236(a)"). And the Notice of Custody Determination invokes Section 1226. *See* Dkt. 17-5 at 2 (advising Teopanta that he is being detained "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations").

This Court addressed an analogous issue in *Hanson v. Joyce*, No. 26-cv-03326 (JLR), 2026 WL 2058445 (S.D.N.Y. July 16, 2026). There, the Court explained that "Section 1225 generally applies to 'arriving' noncitizens, and that word does not describe those who, like [p]etitioner, are already present in the United States because ICE released them on their own recognizance after initially detaining them at or near the border," and that "when the government consistently treats a noncitizen as subject to Section 1226 over a period of months or years, it cannot later change its mind and apply Section 1225 to justify their re-detention." *Id.* at *4. In *Hanson*, the Court noted that the government had indeed treated the petitioner as subject to Section 1226, as evidenced by the fact that the government expressly released the petitioner on her own recognizance after her initial detention, that the petitioner then "lived in the United States for more than a year and a half," that the subsequent arrest warrant "invoke[d] Section 1226," and that her Form I-213 "twice allude[d] to her being detained under Section 1226." *Id.* Similar analysis applies here: The documents presented to the Court demonstrate that Respondents have treated Teopanta, in 2026, as subject to discretionary detention under Section 1226. Respondents attempt to minimize the import of the *Velesaca* worksheet and the Notice of

Custody Determination by asserting that ICE never should have created them, *see* Dkt. 21 at 2; Cowan Decl. ¶¶ 8-9, but — as Teopanta argues, *see* Dkt. 22 at 1 — "[t]he basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted, not on impermissible post hoc rationalizations." *Hanson*, 2026 WL 2058445, at *4 (quotation marks omitted) (quoting *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 486 (S.D.N.Y. 2025)); *see also Bernal Morales v. Joyce*, No. 26-cv-06723 (PAE), 2026 WL 2445050, at *3 (S.D.N.Y. Aug. 20, 2026) ("[W]here ICE invokes § 1226(a) at the point of detention and then takes the contrary position in litigation, . . . the agency's initial representations must be afforded weight.").

Therefore, Teopanta's detention is governed by Section 1226(a).

## II. Teopanta's Detention Under Section 1226(a) Violates Due Process

Having found that Teopanta is detained under Section 1226(a), the Court now turns to whether that detention comports with due process. The Court finds it does not.

The steps required to justify discretionary detention under Section 1226(a) are, by now, well worn. "[B]efore the Government may exercise such discretion to detain a person, '§ 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination,'" and that determination must be "based on two factors — whether [(1)] the noncitizen is a 'danger to property or persons' and [(2)] is 'likely to appear for any future proceeding.'" *Lopez Benitez*, 795 F. Supp. 3d at 492-93 (first quoting *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020); and then quoting 8 C.F.R. § 1236.1(c)(8)). For due process purposes, these bases provide "a sufficiently compelling governmental interest to justify" the noncitizen's detention and create a "commensurately narrow" "class of persons subject to confinement." *Demore v. Kim*, 538 U.S. 510, 557 (2003) (Souter, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted). For that reason, "[i]t is neither arbitrary nor capricious to detain the [noncitizens] when necessary to avoid the risk of

flight or danger to the community." *Zadvydas v. Davis*, 533 U.S. 678, 721 (2001) (Kennedy, J., dissenting). ICE's determination on these questions "shall not be subject to review" in federal court. 8 U.S.C. § 1226(e); *see also, e.g.*, *Lopez Benitez*, 795 F. Supp. 3d at 494-95 (declining to analyze whether government's "proffered basis in its decision to detain [petitioner] [wa]s substantively inadequate in some respect," and noting that government "has wide latitude with respect to its discretion in this regard that is not subject to second-guessing by this [c]ourt").

Generally, then, where the government contends that a noncitizen is mandatorily detained under Section 1225, but the Court finds he is in fact subject to discretionary detention under Section 1226(a), the Court's due process analysis is relatively straightforward: Did the government exercise its discretion and conduct an individualized custody determination in detaining the noncitizen, and find that the noncitizen is a flight risk or danger to the community? If yes, then the noncitizen is entitled to a bond hearing at which he can challenge the substance of that determination; if no, he is entitled to immediate release, because there is no determination for him to administratively challenge. *Compare, e.g.*, *Villegas ex rel. Guzman Andujar v. Francis*, 815 F. Supp. 3d 248, 261-65 (S.D.N.Y. 2025) (ordering petitioner's immediate release where "there is no record evidence that any kind of individualized determination was made" and, thus, "a custody re-determination . . . [would be] an inadequate remedy because there is no initial DHS decision to review"), *with Perez Guedez v. Catletti*, No. 26-cv-02463 (JLR), 2026 WL 962575, at *2-3 (S.D.N.Y. Apr. 9, 2026) (granting habeas petition but ordering bond hearing, rather than release, "[b]ecause ICE made an individualized assessment before detaining [p]etitioner," and thus "a bond hearing at which the government bears the burden of proving, by clear and convincing evidence, that [p]etitioner is a danger to the community or a flight risk is the appropriate remedy"). This case, however, is unique.

The records Respondents produced to this Court in the first instance demonstrated that ICE conducted an initial custody determination, and Respondents relied on that determination in arguing that, if Teopanta's detention is governed by Section 1226(a), then the proper remedy for his habeas petition is a bond hearing. *See* Opp. at 15-16. Yet those same records (and Respondents' briefing) state plainly that, during that initial determination, Teopanta established that he is *not* a flight risk or a danger to the community. *See* Johnson Decl. ¶ 15 (representing that S.D.D.O. Cowan "determined that [Teopanta] established that he did not pose a danger to persons or property, and that [Teopanta] had established that he did not pose a flight risk"); Dkt. 17-4 at 2-3 (*Velesaca* worksheet documenting same findings); *see also* Opp. at 15 ("[O]n August 21, 2026, the Government completed a *Velesaca* individualized custody determination worksheet, determining that Petitioner established that he did not pose a danger to persons or property, and that Petitioner had established that he did not pose a flight risk[.]"). Accordingly, ICE's own determination appeared to be that there was no basis to detain Teopanta, and that Respondents chose to detain him anyway.

Respondents initially offered no explanation for this, other than to parrot S.D.D.O. Johnson's confusingly worded representations that (1) S.D.D.O. Cowan determined that Teopanta was neither a danger nor flight risk, then additionally found that Teopanta has "[n]o ties to the community" and "[i]llegally entered the United States," (2) S.D.D.O. Cowan inadvertently checked the box on the *Velesaca* worksheet stating that Teopanta *had* established that he is not a flight risk when he should have checked off that Teopanta *had not* so established, and (3) S.D.D.O. Cowan made this error "because the following box, 'If the noncitizen does pose a flight risk, have you determined that no forms of release on conditions can mitigate flight risk?' was also marked 'Yes.'" Johnson Decl. ¶ 15; Opp. at 15 n.2. Only after Teopanta pointed out the illogic of those representations, and noted the conspicuous absence of any clarifying

statement from S.D.D.O. Cowan about his own custody determination, *see* Reply at 7-8, did Respondents furnish an explanation from S.D.D.O. Cowan that he checked off the wrong box, *see* Cowan Decl. ¶ 7. Yet S.D.D.O. Cowan also purports to confess to an additional error: Not only should he have checked off a different box, but also, he now claims, he should have "skipped to the bottom" of the form "without completing the danger or flight risk sections" at all, because he "should not have conducted an individualized custody determination under § 1226(a) and . . . the *Velesaca* worksheet was incorrectly filled out." Cowan Decl. ¶¶ 8-9. It remains unclear to the Court, then, even after the Cowan Declaration, just how Respondents suggest this document should be understood: as making a valid flight risk determination but containing an immaterial administrative error, or as filled out entirely in error, such that it should be disregarded. If the latter, then Respondents are asking the Court to disregard ICE's individualized custody determination, as if it never happened, which would require Teopanta's immediate release. *See, e.g.*, *Guzman Andujar*, 815 F. Supp. 3d at 261-65.

But even accepting S.D.D.O. Johnson's and Respondents' characterization of the *Velesaca* worksheet as containing a mere administrative error, the Court finds that ICE's determination was insufficiently individualized. That is a "constitutional[] flaw" in "the discretionary process itself" and, thus, subject to this Court's review. *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (quoting *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011)). Indeed, S.D.D.O. Cowan's only recorded bases for his flight risk determination were Teopanta's purported lack of community ties and his illegal entry into the United States. The community ties finding is undermined by ICE's own paperwork, which notes that Teopanta called his wife upon being detained and that he has multiple children in the United States. *See* Dkt. 17-1 at 4 (noting that Teopanta "claims to have six children all minors" who "currently reside with their biological mother," and that, when "offered a phone call," Teopanta "called his

own phone number . . . and spoke to his wife"). *See also Curimilma Quille v. Blanche*, No. 26-cv-02818 (HG), 2026 WL 1453889, at *4 (E.D.N.Y. May 22, 2026) (finding ICE's initial custody determination inadequate, and thus violative of due process, where ICE found that petitioner lacked community ties, yet ICE's own records from the arrest indicated that petitioner had a U.S.-born child and "'called his girlfriend' after his arrest" (citation omitted)). And the illegal entry finding is broadly applicable to noncitizens detained by ICE — it is not an individualized determination. *See da Cunha*, 175 F.4th at 95 (noting that noncitizens "cannot be said, as a categorical matter, to pose a danger to the community or risk of flight"); *J.T.G. v. Genalo*, No. 26-cv-04521 (AT), 2026 WL 1724325, at *4 n.4 (S.D.N.Y. June 15, 2026) ("[A] *per se* determination of a risk of flight or danger to the community based on a noncitizen's undocumented status alone 'comports not with § 1226(a), but with the government's desired policy of mandatory detention.'" (alterations adopted) (quoting *Pastrana-Beltran v. Mullin*, No. 26-cv-02657 (RER), 2026 WL 1398609, at *2 (E.D.N.Y. May 19, 2026))); *Inestroza Carbajal v. Frazier*, No. 26-cv-02778 (SJB), 2026 WL 1309265, at *4 (E.D.N.Y. May 12, 2026) ("[T]he mere lack of status does not present a per se risk of flight.").

In sum, ICE's own individualized custody determination requires Teopanta's immediate release. And even if the Court were to overlook ICE's and Respondents' repeated statements that Teopanta established that he is neither a danger to the community nor a flight risk, ICE's apparent bases for deeming him a flight risk are insufficiently individualized to constitute an adequate determination under Section 1226(a), and the Court would still order his immediate release.

**CONCLUSION**

For all the foregoing reasons, the Court GRANTS Teopanta's petition for a writ of habeas corpus. Respondents are hereby ordered to transport Teopanta back to the Southern

District of New York by **September 2, 2026**, and then immediately release him. Respondents shall file a letter on the docket by **September 3, 2026**, certifying their compliance with this Order.

Dated: September 1, 2026
New York, New York

SO ORDERED.

Jennifer Rochon
JENNIFER L. ROCHON
United States District Judge